*100* 

MIED ProSe 14 (Rev 5/16) Complaint for Violation of Civil Rights (Prisoner Complaint)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**KALVIN LAMAR WASHINGTON (493833)**

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**v.**

**PAUL T. WALTON (P-45278)**
**TRINIDAD PAREDES #801326**

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)*

Case: 2:22-cv-11316
Assigned To : Michelson, Laurie J.
Referral Judge: Patti, Anthony P.
Assign. Date : 06/06/2022
Description: PRIS WASHINGTON V. WALTON, ET. AL (KB)

Jury Trial:  ☑ Yes  ☐ No
*(check one)*

I'm being instructed not to send
Exhibits by this notice, but on page
11 instructing me to send documents
So what is going on with this unlawful
Instruction?
My exhibits support claims within
this document and as a indigent
prisoner, i cant afford to send exhibits
later, so i'm forwarding all attachments.

## Complaint for Violation of Civil Rights
## (Prisoner Complaint)

PAGE-11, said attach exhibits! **NOTICE**

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.**

**In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in *forma pauperis*.**

How can your NOTICE say not to send exhibits, but the form instruct you to send exhibits and before i did not send exhibits and my pleadings were dismissed without exhibits, so im confused!

MIED ProSe 14 (Rev 5/16)  Complaint for Violation of Civil Rights (Prisoner Complaint)

I.      **The Parties to This Complaint**

   A.      **The Plaintiff(s)**

   Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

   Name    KALVIN LAMAR WASHINGTON (493833)

   All other names by which you have been known:

   _____

   ID Number    MDOC# 493833

   Current Institution    OAKS CORRECTIONAL FACILITY

   Address    1500 Caberfae HWY

   MANISTEE, MICHIGAN 49660

   B.      **The Defendant(s)**

   Provide the information below for each defendant named in the complaint, whether the defendant is an <u>individual</u>, a government agency, an organization, or a corporation. Make sure that the defendant(s) listed below are identical to those contained in the above caption.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

   Defendant No. 1

   Name    PAUL T. WALTON  (P-45278)

   Job or Title    Chief Assistant Prosecutor
   (if known)

   Shield Number    (P-45278)

   Employer    Lapeer County Prosecutor's office

   Address    255 Clay street

   LAPEER, MICHIGAN 48446-2205

   ☑ Individual capacity          ☑ Official capacity

MIED ProSe 14 (Rev 5/16)  Complaint for Violation of Civil Rights (Prisoner Complaint)

Defendant No. 2

| | |
|---|---|
| Name | TRINIDAD PAREDES #801326 |
| Job or Title (if known) | INMATE SERVING 35 years IN PRISON |
| Shield Number | #801326 |
| Employer | OAKS Correctional facility PRISON WORKER |
| Address | 1500 CABERFAE HWY |
| | Manistee, Michigan 49660 |

☑ Individual capacity          ☑ Official capacity

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Shield Number | |
| Employer | |
| Address | |
| | |

☐ Individual capacity          ☐ Official capacity

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Shield Number | |
| Employer | |
| Address | |
| | |

☐ Individual capacity          ☐ Official capacity

## II. Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A. Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☑ State or local officials (a § 1983 claim)

B. Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by <u>state</u> or local officials? <u>Additional Page attached:</u>

#    <u>MALICIOUS - PROSECUTION IS MY CLAIM AND PROBITION</u>, because assistant state prosecutor for the sixth Judicial circuit court for the county of Oakland's <u>MAJOR CRIMES UNIT</u>, disregarded the third Judicial circuit court <u>ORDER of acquittal</u> in case NO. 03-00409-01-FC dated 8-20-03, before <u>he violated the protection</u> against a <u>second PROSECUTION for the same offense after acquittal</u>, <u>which</u> it is well-settled that the <u>Fifth Amendment's</u> Double Jeopardy clause, Made applicable to the states through the <u>Fourteenth Amendment</u>. See <u>BENTON V. MARYLAND</u>. 395 U.S. 784, 794: 89 S.CT. 2056: 23 L.Ed 2d 707 (1969). However, <u>CAREY V. Piphus</u>, 435 U.S. 247, 257-28, (98 S.CT. 1042) Required that i prove proof of termination of the prior criminal proceeding in favor of the accused SEE: <u>Attachment - 1</u>, a court order of acquittal with <u>Exhibit-A</u> and <u>B</u> of both proceedings Attached ment - 2.

C. Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

<u>NONE !</u>

See Additional Page attached
And attachment - one for the court ORDER
AcQuittal dated 8-20-03.

4

CONTINUED FROM II B PAG -4 : (DEPRIVATION OF RIGHTS / PRIVILEGES)

I. MALICIOUS PROSECUTION CLAIMS

A. THE ELEMENTS OF A TORT CLAIM OF MALICIOUS PROSECUTION

1. COMMON LAW TORT ;  2. PERSONAL INJURY CLAIMS AND MORE.

* THE first defendant PAUL T. WALTON (45278), initiated two more additional Jury-trial's after a prior Jury Rendered a not guilty verdict to a question : As instruct- by the court that you must decide who committed the crime that the defendant is charged with - in case NO. 03-4019-01-FC before the court entered its acquittal ( The question alone Removed defendant as a suspect from the alleged crime ) and a Not guilty verdict - terminated the proceeding in his favor on 8-20-03 - see attachment - 1 [A final Judgment].

* Paul T. Walton (45278) continued prosecuting despite the facts that plaintiff's claims of false arrest, by Richard Sanchez And Suzanne Strawntz of the Hazel Park Police station defendant New plaintiff was acquitted of these charges and still persued him until conviction on '04-06-04 in case No. 03-190459-FH.

* Plaintiff maintains that probable cause still do not exist to have arrested him for this crime, Nor impounding his semi- truck on 03-17-03, and the state agency Lost the semi-truck. because after plaintiff been acquitted, custody continued until 3RD Jury trial before the wrongful conviction - from the wrongful prosecution, wrongful imprisonment and wrongful arrest's of both him - his semi-truck with trailer see, Detroit Request for warrant, Affidavit from Hazel Park Police and handwritten statement of witness in attachment - 5, and note the lack of probable cause for plaintiff.

* THE SECOND DEFENDANT TRINIDAD PAREDES (801326) initiated this personal injurie claim when he personally discriminated attack upon plaintiff for being Labled a child Rape ies caused by this wrong- ful conviction - when he assault plaintiff in the head with a weapon causing a life-time injury to the head and mental state of mind so his trust account, bank accounts, personal savings and funds obtained from the Law suit he won by the state of michigan - being sued for $ 250,000 for his injuries he caused upon plaintiff see Reports in attachment-4.

1 of 2.

BOTH DEFENDANT'S VIOLATED AND DEPRIVED PLAINTIFF OF HIS RIGHT'S

*    THE SECOND Defendant TRINIDAD PAREDES (801326)
personally liable for damages under 42 U.S.C.§1983 based
upon actions taken in their official capacities and personal
because as a state inmate at the oaks correctional facility
MR Paredes (801326) WAS instructed by connie horton's officer's
at chippewa correctional facility that inmate Washington
struck two correctional officers in the face and must be
punished for this, because he is in prison for Rape of a
child, so spread the word at ECF - that anyone bring harm
upon him will be rewarded at chippewa correctional facility.
date 04-07-22 at the URF facility where both inmates was
segregated by staff and Paredes arrived on 04-10-22.

    Plaintiff - heared officer Corey-spiker told all the in-
mate's in her unit that inmate Washington is a convicted
child Rape'ies - he Raped a child, and inmate Paredes(801326)
informed everyone at oaks correctional facility before assaulting
plaintiff in the head with a lock in a shock that spite his head open
see video of the incident Reported by the hearing officer attached
in attachment-4, was caused by the wrongful conviction 4-6-04.

    Plaintiff maintains that even doe connie horton didn't do
this her self but she had other officer's do her dirty work and
caused personal injury's that will last a full life time, because other
inmates dont just know what people in prison for unless staff tell
them and i personally heard cory-spiker informed the whole unit so
my life is in danger of more assault's after this incident.

            REQUESTING JURY TRIAL ON
MALICIOUS PROSECUTION CLAIM, DISCRIMINATION, PERSONAL INJURIES
AND DAMAGEIES FROM violation of RIGHT'S / PROTECTIONS OF THE LAWS.


KLW/
CC: File

                        By: Kelvin Lamar Washington
                            MDOC# 493833-IN PRO SE


                    2 of 2.

MIED ProSe 14 (Rev 5/16)  Complaint for Violation of Civil Rights (Prisoner Complaint)

D. Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

*Attachment 2 →*

*Defendant cause a wrongful conviction by Malicious Prosecution!*

See: Exhibit-B; ON 4-6-04, the defendant Paul T. Walton, Not only conducted a Re-trial - as the Oakland County assistant prosecutor - but he Relitigated acquittal evidence from case No. 2003-004019-01-FC, which he was barred by federal authority from doing so - without a court order reversing plaintiff's - Third Judicial Circuit court order dated 08-20-03, the defendant had No authority to relitigate - Nor to continue custody after the order for plaintiff's Immediate discharge from confinement. See court order by the Honorable Judge William Lucas (P-16840) dated 8-20-03, attached No. 1.

Defendant - Paul T. Walton - used his position to ~~abuse old process~~ *Malicious Prosecute plaintiff* by interfering with the ~~Wayne~~ county acquittal evidence ~~by~~ Relitigating against the Fifth Amendment's Double Jeopardy clause protection's - as the prosecutor he knew Wayne County Prosecutor's tried plaintiff of the crime charged, and upon the acquittal of all charges - defendant intentionally violated the protection ~~against~~ *second →* a second prosecution for the same offense after acquittal. ~~Defendant attacked plaintiff with a weapon striking him in the head causing continue suffer by this personal injurie claim by inmate Trinidad Paredes #801226~~
*Attachment - 4.*

III. **Prisoner Status**

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

*See: Additional Page to 5*

☐ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee
☑ Convicted and sentenced state prisoner
☐ Convicted and sentenced federal prisoner
☐ Other *(explain)* _____

IV. **Statement of Claim**

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

<u>Complaint for Violation of Civil Rights</u> (Prisoner Complaint)

<u>Continued from page No. 5 IV:</u> * Claims of Discrimination, deprived of Rights and Malicious prosecution that caused this <u>wrongful</u> conviction under the color of state law.

* Plaintiff is sueing defendant <u>Paul T. Walton (P45278)</u>, for <u>Malice</u> and his Claim of <u>Malicious prosecution</u> that caused this <u>wrongful conviction</u> from disregarding of the <u>prior acquittal</u> terminating in plaintiff's favor for the Same offense that now support the <u>wrongful conviction</u> (after two additional Jury trials to convict) in clear violation of every fifth amendment's double Jeopardy clause protections Causing <u>unlawful arrest - unlawful detention - unlawful Jury trials</u> and <u>unlawful conviction</u> that is classified by defendant's <u>malicious prosecution.</u>

* Second defendant- <u>Trinidad Paredes</u># 801326 caused Serious injuries to plaintiff's <u>head</u> when he intentionally assaulted and attacked with a weapon as a state prisoner at the Oaks Correctional facility where he Recieving from the state <u>1.4 million dollars</u> under class action law suit now and for his unJustified personal assault upon plaintiff, causing continued suffering from a head injurie - he sueing <u>MR Paredes</u> # 801326 for #225000 (for injuries to Plaintiff head from his strikes with the weapon) See attached Reports.

* <u>Trinidad Paredes</u># 801326 Trust account's is being sued for his hate towards Sex offender's which is discriminating against plaintiff's civil Liberty's is a clear violation of his 14TH amendment Rights and equal protection Rights where both defendant's conducted these personal actions under the color of state Laws statutes, ordinance, Regulation, custom, usage and territory when they deprived plaintiff of his civil Rights and equal protection of the Laws by discrimination, and malicious prosecution.

[addition to page No. 5]

MIED ProSe 14 (Rev 5/16)  Complaint for Violation of Civil Rights (Prisoner Complaint)

A.    If the events giving rise to your claim arose outside an institution, describe where and
        when they arose.

Attachment-2
Not

* See: Exhibit-B , On 4-2-04 , at the sixth Judicial circuit court , the
defendant violated the protection against a second presecution for the same
offense after acquittal , by Relitigating acquittal evidence until conviction.
See attachment - 3 , which is the sixth Judicial circuit court's Register of action
showing after the hung Jury trial (after the first acquittal ) defendant
tried plaintiff a third time until conviction 4-6-04 (Case No. 03-190459-FH).

* Completely disRegarding the third Judicial circuit court's acquitta oRdeR *

* A FINAL JUDGMENT IN PLAINTIFF'S FAVOR ATTACHMENT-1 *
( CASE No. 03-4019-01-FC ) ATTACHMENT-2

B.    If the events giving rise to your claim arose in an institution, describe where and when
        they arose.

* See: Attachment-4 , On the alleged victims birthday , 11-16-16 ,
Someone lookup plaintiff's case at the chippewa Correctional facility and
spreaded the words that he is a child-Rapies , which caused him to
be hit / struck in the head with a weapon [spitting his head open.]

* Again , the same thing happened at the Oaks correctional facility
Someone spreaded the word that i was in prison for Moleasing
a child and was struck from an attack upon me because
being lable as a child-Rapies is forever here in prison.
See: attachment-4, dated 4-26-22.
      As PRoof - i have maRks in my head in two locations.
* FRom defendant's false lable of me from his malicious prosecution of me! *

C.    What date and approximate time did the events giving rise to your claim(s) occur?

* I attached this information in attachment-5 , which is
the Reports of the actual incidents 11-16-16 , and 4-26-22.

D. What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

\* A final Judgment of acquittal Rendered in plaintiff's favor in case No. 03-004019-01-FC, 8·20·03 !

Exhibit A / Attachment-2

Plaintiff was convicted in a second Jury trial for a crime the first Jury found him Not guilty of committing, And defendant Paul T. Walton deprived plaintiff of the equal protection of the laws guaranteed by the fourteenth Amendment. [Exhibit-A, 8-13-03].

Exhibit-B / Attachment-2

\* Plaintiff was forced to serve a 20 year prison sentence for a crime he was found not guilty of committing, which is wrong, because the first Jury Rendered a general verdict that the Honorable Judge William Lucas (16840) entered into Record for plaintiff's immediate discharge from confinement and the prosecutor intentionally disregarded that order by violating the protection against a second prosecution for the same offense after acquittal.

Exhibit-B / Attachment-2

\* Ofcourse their were other people present at the Jury trial See: Exhibit-B, where the Honorable Judge Richard D. Kuhn, defense counsel Richard T. Taylor, and the whole Jury who found me guilty.

Exhibit-B / Attachment-2

\* The sixth Judicial circuit court Judge sentence plaintiff to serve 20 to 30 years in state prison and been denying his pleadings every since - disregarding evidence from the first Jury-trial's acquittal, which explain why plaintiff served 19 year's on the 20 to 30 year sentence.

\* Which is Why plaintiff - filing the common law of torts - under Malicious Prosecution against defendant - Paul T. Walton (P45778), See final Judgment of acquittal dated 8·20·03, in case No. 2003-004019-01-FC. (Attachment-1). RENDERED IN PLAINTIFF'S FAVOR before the court dismissed the Jury which ended that controversy until defendant disregarded the acquittal order and Rendered two additional Jury trials until conviction, which clearly violated the protection trigged by the acquittal against a second prosecution for the same offense after acquittal 4-6-04. See: Carey v. Piphus, 435 U.S. 247, 257-258; 98 S.ct. 1042; 55 L.Ed 2d 252 (1978).

Attachment No. 3

\* Judgment in plaintiff's favor terminated the prior proceeding 8-20-03, before two more additional Jury trials conducted just to convict plaintiff for the charge he was acquitted of committing in case No. 2003-004019-01, which is Five months before the second trial and eight months for the third Jury trial in case No. 2003-190459-FH, on 04-06-04.

ATTACHMENT-3 / Both Register of actions

MIED ProSe 14 (Rev 5/16)  Complaint for Violation of Civil Rights (Prisoner Complaint)

## V.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

* After serving 19-years of my life in state prison for a crime the first jury was made to "decide" who committed this crime that the plaintiff is charged with, Nor did he engage in NONCONSENSUAL sexual actival with the complainant witness, Terrie Dowl, so yes my mental is affective by this wrongful conviction, that was obtained by the criminal Malicious prosecution conducted by the defendant - Paul T. Walton.

* Plaintiff has been seriously injuried in the head twice by two different prisoners because of this lable Paul T. Walton place on him for life and Requesting assistant to help me get over all the people i losed and will never see again, from being deprived my freedoms.

* I was semi-treated by the prison Medical department, but i'm still being denied Mental-treatment Especially now after being placed in Segregation for over being struck in the head 4-26-22 J.

      From being lable a child Rapies has taken it's toll on me, after my acquittal, i mean come on people, i did not Rape anyone and still has to wear this stain on my name for the rest of my life ( please help me get some help from Real people who understand

## VI.    Relief     and not someone trying to keep their job with the people who unlawfully holding me.

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes.  If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

* Enforce the Honorable Judge William Lucas (16840) Court order of acquittal dated 08-20-03 for Plaintiff's immediate discharge from confinement thats been wrongfully disRegarded by the defendant Paul T. Walton (45278), and Respectfully Requesting to be Released from custody after serving 19 years in state prison - for a crime i was acquitted of committing, because the verdict was Render in plaintiff's favor, as Noted!

* My Semi-Truck was impounded by the city of Detroit 3-17-03, and no one seem's to no what happen with it, so plaintiff Requesting damagies for Lost wages and a New semi-truck, because his partnership with Polar Bear Express been destroied after 19 years in Prison. Requesting 10 million for lost wagies and money damages.

* As far as funds over all: 72 million Requested and being that i am a citizen of Wayne County in the city of Detroit. Requesting 5 million in property seized by the city and state and to clear the water dept problems of Highland Park, so that our city can start Rebuilding. Thank You, and allow the final judgment to support the Malicious prosecution claim in this civil-complaint speak for Detroit. for this wrongful conviction.

## VII. Exhaustion of Administrative Remedies Administrative Procedures

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures. Your case may be dismissed if you have not exhausted your administrative remedies.

A. Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☑ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

#1. Chippewa Correctional Facility 4269 West M-80 Kincheloe 49783
#2. Oaks Correctional Facility 1500 Caberfae Hwy Manistee, Michigan 49660

B. Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑ Yes

☑ No

☐ Do not know

C. Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☑ Yes

☐ No

☑ Do not know

If yes, which claim(s)?

administrative claims is different from
incident claims, but is all the same procedures
Just one is grievance and the other is Hearing's

MIED ProSe 14 (Rev 5/16)  Complaint for Violation of Civil Rights (Prisoner Complaint)

D.    Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☐  Yes   Hearings
          ONLY incident Reports, of head injuries
☑  No          and fights claimed from being attacked.

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐  Yes   I was placed in segregation for protection over
☑  No    attacks for being lableo a child Raper, caused
         by defendant's malicious prosecution of me after
         i was acquitted of committing this crime.

E.    If you did file a grievance:

1.    Where did you file the grievance?

administrative Hearings
were conducted.
         ONLY Reports of attacks at two different Facility's
NONE     and appealed, because i was punished from attacks

2.    What did you claim in your grievance?

administrative, Hearings
were conducted.
         ONLY Placed in protective Custody over attacks,
         because my life is in Danger in PRISON over
NONE     this lable as a child Rapies

3.    What was the result, if any?

         ONLY Reports is incident Reports that were
NONE     appealed and denied me a victim of these
         attacks (they classified as fighting when you being
                   attacked!)

4.      What steps, if any, did you take to appeal that decision?  Is the grievance process completed?  If not, explain why not.  *(Describe all efforts to appeal to the highest level of the grievance process.)*

I was heard on the incident Report's, found guilty and appeal the decision, only to be denied again, documents attached in attachment-4, as proof.

F.      If you did not file a grievance:

1.      If there are any reasons why you did not file a grievance, state them here:

Aministrative Hearing officers found me Guilty: I was found guilty -placed in segregation for each incident, because i fought my attacker's so that other people will see that i can fight, so they could stop coming at me, for being labled a child Rapies

2.      If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

See incident Report's attached !
Attachment- 4

G.      Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

Only -Request for Rehearing Response's all been denied !
By administrative process attachment-4

*(Note:  You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*  How can this document state on the first page not to send exhibits, but here it instruct me to send exhibits. Im confused !

**VIII.  Previous Lawsuits**

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐　　Yes

☑　　No

If so, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

A.　Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐　　Yes

☑　　No

B.　If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.　Parties to the previous lawsuit

Plaintiff(s)　_____

Defendant(s)　_____

2.　Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.　Docket or index number

_____

MIED ProSe 14 (Rev 5/16) Complaint for Violation of Civil Rights (Prisoner Complaint)

    4.    Name of Judge assigned to your case

    _____

    5.    Approximate date of filing lawsuit

    _____

    6.    Is the case still pending?

        ☐    Yes

        ☐    No

    If no, give the approximate date of disposition. _____

    7.    What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

C.    Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

    ☐    Yes

    ☑    No

D.    If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

    1.    Parties to the previous lawsuit

        Plaintiff(s)    _____

        Defendant(s)    _____

    2.    Court *(if federal court, name the district; if state court, name the county and State)*

    3.    Docket or index number

    _____

MIED ProSe 14 (Rev 5/16)  Complaint for Violation of Civil Rights (Prisoner Complaint)

4.      Name of Judge assigned to your case

_____

5.      Approximate date of filing lawsuit

_____

6.      Is the case still pending?

☐      Yes

☐      No

If no, give the approximate date of disposition.  _____

7.      What was the result of the case?  *(For example:  Was the case dismissed?  Was judgment entered in your favor?  Was the case appealed?)*

_____

_____

## IX.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  _JUNE 6th_ , 20 _22_ .

Signature of Plaintiff      _Kalvin Lamar Washington_

Printed Name of Plaintiff    _KALVIN LAMAR WASHINGTON_

Prison Identification #  _493833_

Prison Address   _OAKS CORRECTIONAL FACILITY 1500 Caberfae HWY_

_Manistee_          _Michigan_          _49660_

City                State                Zip Code

MIED ProSe 14 (Rev 5/16)  Complaint for Violation of Civil Rights (Prisoner Complaint)

**Additional Information:**   Plaintiff - KALVIN LAMAR WASHINGTON, MDOC# 493833, in prose, Respectfully Request this Honorable court to please take Judicial Notice pursuant to ~~Fed.R.Ev.§ 201~~ (1) and enforce the protection against a second prosecution for the same offense after acquittal according to BENTON v. MARYLAND, supra, at 794.

Plaintiff maintains that he was unlawfully arrested by the Detroit Police (Regarding this crime charged against complainant witness TRENE DOUGL) see both Detroit Police documents, that don't explain how plaintiff was NAMED as a suspect, once the alleged witness named some one other than him - so both document lack valid reasoning to establish probable cause to arrest - as NO PERSON claimed he did anything wrong but Police officer Richard Sanchez, who claimed plaintiff a suspect.

The same issue with the Hazel Park Police documents, which is very unlawful to say the lease - because on page 3 of 4, this officer completely lied about claim that a anonymous phone call from a female informing her that KALVIN Washington has been arrested on 3-11-03 because why wait until 3-31-03 to make out report or how can you explain both police departments falsely accusing plaintiff for a crime the alleged victim claimed that some one else committed against her on 02-09-03 [see hand written statement attached] (see attachment - 5)

All documents in attachment - 5, support plaintiff's claim that he is falsely accused for a crime the witness statement claimed someone else committed, before Richard Sanchez intentionally lied in his 03-10-03 Request for warrant that caused a unlawful arrest, which continued with more unjustified lies from his partner's report that failed to mention her report is identical to Richard Sanchez Report - only that she made up a caller who failed to identify who was informed by defendant / plaintiff Kalvin L. Washington, and lack probable cause to arrest - based on the witness handwritten statement that never once name plaintiff for any wrongs caused upon on her 02-9-03. (see attached - documents in attachment - 5)

# Attachment 1

| Approved, SCAO | 1st copy - Prosecutor | 3rd copy - Defendant attorney |
|---|---|---|

| STATE OF MICHIGAN THIRD JUDICIAL COURT CRIMINAL DIVISION | ORDER OF ACQUITTAL/DISMISSAL OR REMAND | CASE NO. 03-04019 |
|---|---|---|

ORI MI-

Court address

Court telephone no. 313-224-2500

THE PEOPLE OF

☐ The State of Michigan

☐ _____

v

Defendant's name, address, and telephone no.
Kalvin Washington

| CTN 9203306622 | SID | DOB 8-15-72 |
|---|---|---|

| Count | CRIME | CHARGE CODE(S) MCL citation/PACC Code |
|---|---|---|
| 1-5 | CSC 1st | 750.520b1f |
| 6-8 | CSC 3rd | 750.520D18 |
| | | |

**IT IS ORDERED:**

☐ 1. The case is dismissed on the motion of the court ☐ with ☐ without prejudice.

☐ 2. The defendant's motion for dismissal is granted ☐ with ☐ without prejudice and the case is dismissed.

☐ 3. The defendant's motion for dismissal is granted in part ☐ with ☐ without prejudice and the following charge(s) is/are dismissed: _____

_____

☒ 4. Defendant is acquitted on all charge(s) in this case after trial by ☐ judge. ☒ jury.

☐ 5. Defendant is acquitted after trial by ☐ judge ☐ jury only on the following charge(s): _____

_____

☒ 6. Defendant shall be immediately discharged from confinement in this case.

☐ 7. Bond is cancelled and shall be returned after costs are deducted.

☐ 8. Bond/bail is continued on the remaining charge(s).

☐ 9. The case is remanded to the _____ district court for further proceedings for the following reasons:

| 8/28/03 | William Lucas | 16840 |
|---|---|---|
| Date | Judge | Bar no. |

If item 1, 2, or 4 is checked, the clerk of the court shall send a photocopy of this order to the Michigan State Police Central Division to create a criminal history record as required under MCL 769.16a.

MC 262 (1/98) **ORDER OF ACQUITTAL/DISMISSAL OR REMAND**

COURT

STATE OF MICHIGAN

**IN THE THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE**
**CRIMINAL DIVISION**

**FORM OF VERDICT**

People of the State of Michigan

Hon. William Lucas
Case No. 03-4019

V

Kalvin Washington, Defendant
_____ /

**We the Jury make the following findings:**

**Count 1**          **CSC 1st Degree (Personal Injury – Sexual Intercourse)**

☒   Not guilty.

Or

☐   Guilty of CSC 1st Degree.

Or

☐   Guilty of lesser crime of CSC 3rd Degree.

**Count 2**          **CSC 1st Degree (Personal Injury – Sexual Intercourse)**

☒   Not guilty.

Or

☐   Guilty of CSC 1st Degree.

Or

☐   Guilty of lesser crime of CSC 3rd Degree.

**Count 3**          **CSC 1st Degree (Personal Injury – Sexual Intercourse)**

☒   Not guilty.

Or

☐   Guilty of CSC 1st Degree.

Or

☐   Guilty of lesser crime of CSC 3rd Degree.

**Count 4**

☒ Not guilty.

Or

☐ Guilty of CSC 1st Degree.

Or

☐ Guilty of lesser crime of CSC 3rd Degree.


**Count 5**          **CSC 1st Degree (Personal Injury – Cunnilingus)**

☒ Not guilty.

Or

☐ Guilty of CSC 1st Degree.

Or

☐ Guilty of lesser crime of CSC 3rd Degree.


**Count 6**          **CSC 3rd Degree (Force or Coercion – Fellatio)**

☒ Not guilty.

Or

☐ Guilty.


**Count 7**          **CSC 3rd Degree (Force or Coercion – Fellatio)**

☒ Not guilty.

Or

☐ Guilty.


**Count 8**          **CSC 3rd Degree (Force or Coercion – Fellatio)**

☒ Not guilty.

Or

☐ Guilty.


**8/20/03**
Date

_[signature]_
Foreperson

# Attachment 2

# EXHIBIT A

```
1                    STATE OF MICHIGAN

2       IN THE 36TH DISTRICT COURT FOR THE CITY OF DETROIT

3

4  PEOPLE OF THE STATE OF MICHIGAN,

5

6          -vs-                      Case No. 03-4019

7

8  KALVIN WASHINGTON,

9                         Defendant.
                                              /
10

11                       JURY TRIAL

12          Proceedings had and testimony taken in the

13  above-entitled cause before the HONORABLE WILLIAM LUCAS,

14  Judge, on August 13, 2003.

15  APPEARANCES:

16  FOR THE PEOPLE:     LORI DAWSON P40665
                        Wayne County Prosecutor's Office
17                      1441 St. Antoine
                        Detroit, Michigan  48226
18

19  FOR THE DEFENDANT:  JOHN CHRISTIAN ROBINSON P63744

20

21

22

23

24
   REPORTED BY:  A. Conners,
25               Official Court Reporter.
```

COPY

Processed
Notice of Filing Sent
11/7/19 C8
Clerk

2019 OCT 30  PM 12: 40

1

                              RECROSS-EXAMINATION

BY MR. ROBINSON:

Q   And based on your expert opinion, can Mr. Washington

    be included?

A   At the markers I looked at he is included as a donor

    to that sample.

Q   But there's a possibility that he can't be included

    based on that information, correct?

A   Based on the information that I obtained, the data I

    obtained he's included as a possible donor.

Q   Possible donor, correct?

A   Yes.

                    MR. ROBINSON:  Thank you.

                    MS. DAWSON:  Thank you.

                    THE COURT:  You can step down.

                    **TIR'NI DOWL,**

    having first been duly sworn at 3:01 p.m. was called

    as a witness and testified as follows:

                    THE WITNESS:  Yes.

                      DIRECT EXAMINATION

BY MS. DAWSON:

Q   Could you tell all of us your name?

A   Tir'Ni Dowl.

Q   Say your name again for us?

A   Tir'Ni Dowl.

1  Q    Ms. Dowl, how old are you?

2  A    Sixteen.

3  Q    Now, I want to direct your attention back to February

4       of this year.  And in February of this year, ma'am,

5       what city did you live in?

6  A    Detroit.

7  Q    And what street did you live on?

8  A    Bishop.

9  Q    Bishop street in the city of Detroit.

10                      And where did -- you who did you live

11      with?

12 A    My mother and my three brothers.

13 Q    Are your brothers older or younger than you?

14 A    Younger.

15 Q    Now, in February 2003 did you no someone by the name

16      of Kalvin Washington?

17 A    Yes.

18 Q    Do you see him in the courtroom here today?

19 A    Yes.

20 Q    Where is he?

21 A    He right there.  (Indicating)

22                      MS. DAWSON:  Let the record reflect the

23      witness has identified the defendant, Mr. Kalvin

24      Washington.

25 BY MS. DAWSON:

148

1   Q   How did you know Mr. Washington?

2   A   He was it dating my mother at the time.

3   Q   And how long, as of February how long had he been

4       dating your mother?

5   A   A month and a half.

6   Q   Now, specifically I want to direct your attention to,

7       I believe it would be February 19th?

8   A   9th.

9   Q   February 9th.  Okay, thank you.

10                      And on February 9th I want you to tell

11      us at night or in the evening where were you?

12  A   In the house at home.

13  Q   Who were you with?

14  A   My brother.

15  Q   Where was your mother?

16  A   She was gone.

17  Q   Do you know where she was?

18  A   No.

19  Q   And at some point, did Mr. Washington contact your

20      house?

21  A   Yes.

22  Q   Did he call on the phone?

23  A   Yes.

24  Q   Who talked to him?

25  A   I did.

1  Q  And about what time was this?

2  A  This was around seven.

3  Q  7 o'clock at night?

4  A  Yes.

5  Q  Do you recall what day of the week this was?

6  A  A Sunday.

7  Q  And Mr. Washington called your house.  And what did he

8     say?

9  A  He told me to come outside.

10 Q  And you knew Mr. Washington, correct?

11 A  Yes.

12 Q  So he asked you to go outside, and did you go outside?

13 A  Yes.

14 Q  And was he there?

15 A  Yes.  He was just pulling up as I was walking outside.

16 Q  And he was in a vehicle?

17 A  Yes.

18 Q  A car or a truck?

19 A  A car.

20 Q  And did you know him to drive a particular vehicle?

21 A  Yes.

22 Q  Did you recognize the car?

23 A  Yes.  I recognize the car.

24 Q  Did you know him to drive anything else?

25 A  No.  I knew he was a truck driver, he drive trucks.

```
 1  Q    He was a truck driver?

 2  A    Yes.

 3  Q    Had you ever seen his truck?

 4  A    No.

 5  Q    So on February 9th about 7 o'clock in evening

 6       Mr. Washington pulled and he asked you to come out of

 7       your house?

 8  A    Yes.

 9  Q    Did you go out to the car?

10  A    Yes.

11  Q    Was there anyone also in the car?

12  A    No.

13  Q    So what happened when you went up to the car?

14  A    He told me to get in.  I got in the car.

15  Q    And where did you think you were going?

16  A    I thought I was going shopping or getting something to

17       eat.

18  Q    Had you talked to him about where you were going or

19       did you know where you were going?

20  A    I hadn't talked to him.  All I know is we was in the

21       car and he started talking, and he said I'm about to

22       become a young lady tonight.

23  Q    I'm sorry.  You get in the car and what did he say?

24  A    He was talking about I was about to become a young

25       lady tonight.
```

151

1   Q   And then what happened?

2   A   And then he was driving.  I don't remember everything

3       he was saying but that's basically what he was saying.

4       And all I know we had ended up at the Guess Hotel in

5       Hazel Park.

6   Q   How long did you drive?

7   A   Maybe like 15, 20 minute drive.

8   Q   And you ended up where?

9   A   At the guess Hotel in Hazel Park.

10  Q   The guess hotel in Hazel Park?

11  A   Yes.

12  Q   And what happened?

13  A   We was in car.

14  Q   You were in the front seat passenger seat?

15  A   Yes.

16  Q   And he was behind the wheel?

17  A   Yes.

18  Q   And then what happened?

19  A   He told me to give him a kiss.

20  Q   What did you do?

21  A   I told him no.  And that's when he grabbed my head and

22      put his tongue in my mouth.

23  Q   And then what happened?

24  A   And I pulled way and started to get stared and nervous

25      because I knew something was about to happen at that

152

1     time.

2  Q   So what did you do?

3  A   I didn't do nothing.  I just sat there.  And then

4     that's when he was talking about he was about to take

5     that.

6  Q   Take what?

7  A   My virginity.  He kept telling me, I'm about to take

8     that.  He was pointing at my vagina saying he was

9     about to take that.

10  Q   So what did he do?

11  A   Told me to take my pants off.

12  Q   So what did you do?

13  A   I took them off.  And then he was telling me to put my

14     seat back and he pulled it -- I was pulling my seat

15     back and then --

16  Q   -- had he threatened you?

17  A   Yeah.  Well, he had threatened me at the time he had

18     his hand like he was about to back-hand me at that

19     time.

20  Q   So he had his hand up how?

21  A   Like this.  Like he was about to back-hand me.

22     (Indicating)

23  Q   So he said you better take your pants down?

24  A   He didn't say better.  He said take your pants down.

25  Q   So he had his hand up?

1   A   Yes.

2   Q   Says take your pants down?

3   A   Yes.

4   Q   And then what happened?

5   A   I took my pants down and he told me put my seat back.

6       And he told me to take my pants and my panties off.

7       He got in front of me, and at that time I was on my

8       menstrual cycle.  And he had pulled my legs up and

9       started to performing oral sex on me.

10  Q   So did some portion of his body go into yours?

11  A   His tongue was -- he had I felt his tongue on my

12      vagina.

13  Q   Then what happened?

14  A   And then he stopped.  And I was crying and he was like

15      you scared and I was like yeah because I'm shaking and

16      I was crying.  And he got back to his seat.  And he

17      told me your mama didn't tell you I was supposed to

18      take you out to the hotel and take your virginity.

19  Q   So what did you say?

20  A   I told him, I don't think my mama would do that.  And

21      I was shaking my head and I'm scared.  And he kept

22      asking do I want to go get a hotel room and I said no.

23  Q   Then what happened?

24  A   Then he was drinking at the time too.  So by then we

25      drove off and we ended up at this carwash, a hand

1      carwash.

2  Q    What city were you in at this point?

3  A    We was back in Detroit.

4  Q    So you ended up in the carwash, and then what

5      happened?

6  A    He was telling me he was about to go wash his car

7      right quick and thinking I was about to go back home.

8      But he ended up at the carwash and he told me to take

9      my pants off again.

10  Q    So what happened?

11  A    I took them off again.  And this time he pulled his

12      pants down and he took his penis out and he was

13      telling me to suck on his penis.

14  Q    And what did you do?

15  A    I told him no.  And he was like, you telling me no,

16      you telling me no?  And I'm like, no.  I'm not going

17      to do that.  And he said well, you're not going home

18      until you kiss me.  You don't know how to kiss me, you

19      don't know how to love me.  And I kept saying no.

20                      And then that's when he pulled my seat

21      back again and he started performing oral sex on me

22      again.

23  Q    This is at the carwash.  Do you know where the carwash

24      was?

25  A    I remember on the freeway we got off at 8 Mile and I

1       saw a street called Dequindre.  I'm not sure.

2   Q   You didn't recognize where you were?

3   A   No.  It was real dark outside.

4   Q   After he performed oral sex on you again, what

5       happened?

6   A   He got off his seat and said, what is you crying for

7       and he started calling me names.

8   Q   What did he call you?

9   A   He called me a bitch.  He said I was acting like one.

10  Q   And then what happened?

11  A   And then he kept saying you don't know how to love

12      me -- and then he asked me had I ever been beaten

13      before and I said no.  And so he said, you're not

14      going home until you kiss me until you know how to

15      love me.  And then he told me, put your pants back on.

16                  And that's when he drove off.  And we

17      went home, well we was on the way home but he kept

18      stopping telling me I'm not going to go home until I

19      kiss him.  And then he told me when you go home tell

20      your mother that you're not feeling good -- if she ask

21      you where we been, tell her you went shopping or

22      whatever.

23                  And on the next day tell her, I'm not

24      feeling good.  And when everybody leave go take a

25      shower, go lay in my mother's bed, and he'll get it

```
 1        when he get back.  And if I didn't he would take it
 2        out on my Aunt and uncle that live next door.
 3   Q    He said what?
 4   A    He was going to kill my brothers and Aunt and uncle
 5        next door.
 6   Q    If you told?
 7   A    If I didn't do what he asked me to do.
 8   Q    So if you didn't do what he asked you to do, he was
 9        going to kill your brother?
10   A    The people next door which was my Aunt and uncle.
11   Q    So he threatened your family?
12   A    Yes.
13   Q    How old were you when this happened?
14   A    Sixteen.
15   Q    Did he take you home?
16   A    Yes.
17   Q    What happened when he took you home?
18   A    We got into the house and he told me to go over what I
19        was supposed to say to my mother.  And then I got in
20        the house he touched me again.
21   Q    Where did he touch you?
22   A    On my butt.  And we went in the house and I went to my
23        room and he went in my mother's room.
24   Q    Was your mother home at this time?
25   A    Yes.
```

157

1  Q    So then what happened?

2  A    I went to my room.  He went upstairs.  And then

3       something told me to go to my mother's door.  I went

4       to my mother's door and I heard her crying and he

5       telling her to shut up.  And that's when I woke my

6       brothers up, took them out the house and left.

7  Q    So you went to your mother's door?

8  A    Yes.

9  Q    And you heard Mr. Washington in your mother's room?

10 A    Yes.

11 Q    Could you hear your mother?

12 A    Yes.  She was crying.

13 Q    And he told her?

14 A    To shut up.  He told her to shut up.  He kept telling

15      her to shut up.  It seems like he had --

16             MR. ROBINSON:  -- objection to

17      speculation.  It seems like.  Her answer is going to

18      be speculative.

19             MS. DAWSON:  I'll rephrase.

20             THE COURT:  Rephrase the question.

21 BY MS. DAWSON:

22 Q    What could you hear?  Describe for us what you heard?

23 A    When I got to the door I heard him telling my mother

24      to shut up and she was crying.  That's what I heard.

25 Q    Now, was it muffled?

```
 1  A    What do you mean?

 2  Q    Did it sound like she had something over her face?

 3  A    That's what it sound like.  He had his hand over her

 4       mouth.  And that's when I took my brothers and left

 5       out the house.

 6  Q    You gathered your little brothers?

 7  A    Yes.

 8  Q    And you ran?

 9  A    Yes.

10  Q    Where did you go?

11  A    To my youngest brother's uncle house.

12  Q    Is that close by?

13  A    It was eight blocks away.

14  Q    So you ran eight blocks?

15  A    We walked.

16  Q    You walked eight blocks?

17  A    Because I took my brothers to a route where I knew he

18       didn't know where they lived.

19  Q    So you were trying to go somewhere that Mr. Washington

20       didn't know about?

21  A    Yes.

22  Q    So you walked with your brothers eight blocks?

23  A    Yes.

24  Q    And what did you -- what did you do when you got

25       there?
```

1    A    I knocked on the door and I told them that my mother's

2         boyfriend, he just molested me.  I need to call the

3         police.

4    Q    Did you call the police right a way?

5    A    Yeah.  They called the police and they came.  And they

6         told me that I have to go to Hazel Park police to tell

7         them what happened because that's where it happened.

8         And on the same night we went to the Hazel Park

9         police.  And that's when I wrote out the statement.

10   Q    Did, at any time you agree to have any kind of sexual

11        relation with the defendant?

12   A    No.

13                      MS. DAWSON:  Thank you.

14                      CROSS-EXAMINATION

15   BY MR. ROBINSON:

16   Q    Good afternoon.

17   A    Hello.

18   Q    How old are you now?

19   A    Sixteen.

20   Q    You're still 16?

21   A    Yes.

22   Q    And you said that this occurred on a Sunday, correct?

23   A    Yes.

24   Q    Sunday near or about 7 o'clock, correct?

25   A    Yes.

1   Q   And you said that there was some indication that

2       possibly you were going to go shopping, correct?

3   A   Yes.

4   Q   On a Sunday at 7:00?

5   A   Yes.

6   Q   Where were you going to go?

7   A   I thought we were going shopping and get something to

8       eat.

9   Q   But normally, most places that you shop on Sunday, the

10      malls close on Sunday at about that time; is that

11      correct?

12  A   I believe so.

13  Q   But also possibly, yall were going to go get something

14      to eat, right?

15  A   Yes.

16  Q   And do you recall testifying at a preliminary exam in

17      Hazel Park back on Tuesday, May 27, 2003?

18  A   Yes.

19  Q   And do you recall at that time saying that well, we

20      were going to go shopping, or, we were going to go get

21      something to eat?

22  A   I remember saying that.

23  Q   You do recall saying that?

24  A   Yes.

25  Q   At that time?

```
1    A    Yes.

2                        MR. ROBINSON:  May I approach, your

3         Honor?

4                        THE COURT:  Yes.

5    BY MR. ROBINSON:

6    Q    So you don't recall just saying we were going to go

7         shopping, so you said that yall were going to go

8         shopping and get something to eat?

9    A    That's what I thought.  We were going to go shopping.

10   Q    And that's what you testified to at the preliminary

11        exam in Hazel Park, correct?

12                       May I approach, your Honor?

13                       THE COURT:  Yes.

14                       MR. ROBINSON:  You know what, I'll

15        withdraw the question.

16   BY MR. ROBINSON:

17   Q    But yall didn't go get anything to eat?

18   A    No.

19   Q    And you didn't go shopping?

20   A    (No response)

21   Q    Did it appear that you were even headed in the

22        direction of the mall?

23   A    Well, after everything occurred, we had found a Burger

24        King.  And he asked me was I hungry and did I want to

25        get my brothers something to eat and I said no.
```

162

1  Q    You mean prior to everything occurring?

2  A    No.

3  Q    And when you first got home after this allegedly had

4       taken place was your mother at home?

5  A    Yes.

6  Q    And you said nothing to your mother about this?

7  A    No.  Not until the next day.

8                 MR. ROBINSON:  No further questions.

9                 THE COURT:  Thank you.  And you may

10     stand down, dear.

11               MS. DAWSON:  Thank you, Judge.

12               THE COURT:  Let me interject something

13     here at this moment.

14             Ladies and gentlemen of the jury,

15    you've heard evidence that was introduced to show that

16    the defendant committed a crime for which he is not on

17    trial.

18          If you believe this evidence, you must

19    be very careful only to consider it for certain

20    purposes.  You may only think about whether this crime

21    tended to show the following:

22         That the defendant specifically meant

23    to engage in a nonconsensual sexual activity.  That

24    the defendant acted purposefully, that is; not by

25    accident or mistake or because his misjudged the

1    situation.

2              That the defendant used a planned

3    system or characteristic scheme that he has used

4    before or since.  You have to decide who committed the

5    crime that the defendant is charged with.  That the

6    defendant engaged in nonconsensual sexual activity

7    with the complainant.  You must not consider this

8    evidence for any other purpose.

9              For example you must not decide that it

10   showed the defendant is a bad person, or that he is

11   likely to commit crimes.  You must not convict the

12   defendant here because you think he is guilty of other

13   bad conduct.  All the evidence must convince you

14   beyond a reasonable doubt that the defendant committed

15   this alleged crime, or you must find him not guilty.

16   And I will repeat that.

17              Next witness, please.

18              MS. DAWSON:  May we approach, your

19   Honor?

20              THE COURT:  Yes.

21                  (Side bar)

22              THE COURT:  With that ladies and

23   gentlemen it's time to take our afternoon break for

24   15 minutes.

25              (Jury out at 3:20 p.m.)

REPORTER'S CERTIFICATE

- - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF MICHIGAN )

)

)

)

COUNTY OF WAYNE )

I, do hereby certify that the foregoing proceedings of People of the State of Michigan versus **Kalvin Washington**, consisting of 181 pages was stenographically taken at the time and place hereinbefore set forth; that the same was later reduced to typewritten form; and that the foregoing is a full, true and accurate transcript of the proceedings so taken.

ALFREDA R. CONNERS, CSR-5119

# EXHIBIT B

STATE OF MICHIGAN

IN THE SIXTH JUDICIAL CIRCUIT COURT, COUNTY OF OAKLAND

The People of the State of Michigan,

Plaintiff

vs                    File No. CR 2003-190459-FH

Kalvin Lamar Washington,

Defendant.

_____/

# T R I A L

Proceedings had in the above-entitled matter, held before the **HONORABLE RICHARD D. KUHN**, Judge of the Sixth Judicial Circuit Court, COUNTY OF OAKLAND, on Thursday April 1st, 2004 (1st day.)

APPEARANCES:

PAUL WALTON
Attorney-at-Law

Appearing on behalf of the Plaintiff

RICHARD T. TAYLOR
Attorney-at-Law

Appearing on behalf of the Defendant

**LYNN E. ERICKSON, OFFICIAL COURT REPORTER    CSR-0188**

1

# I N D E X

|  | PAGE |
|---|---|
| Opening Statement by Mr. Walton | 52 |
| Opening Statement by Mr. Taylor | 61 |

| WITNESSES:    PEOPLE | PAGE |
|---|---|

TIRNI DOWL

|  |  |
|---|---|
| Direct Examination by Mr. Walton | 69 |
| Cross-Examination by Mr. Taylor | 127 |
| Redirect Examination by Mr. Walton | 161 |

RA'LEISHA DOWL

|  |  |
|---|---|
| Direct Examination by Mr. Walton | 162 |
| Cross-Examination by Mr. Taylor | 203 |

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1   Q     You have no problem yelling at your little brother do

 2         you?

 3   A     No.

 4   Q     Okay.

 5             So you should have no problem yelling at me.

 6             Understood?

 7   A     Yes.   Yes.

 8   Q     Okay.

 9             Are you okay?

10   A     (No verbal response.)

11   Q     Yes?

12   A     Yes.

13   Q     Can you say it?

14   A     Yes.

15   Q     What's wrong?

16   A     I've got asthma.

17   Q     Well if you need a break or need some water, there's

18         some water next to you, okay?

19   A     (No verbal response.)

20   Q     TirNi, if I can, I want to take you back to the date

21         of February 9th, 2003.

22             Do you remember where you were living at the

23         time?

24   A     Yes.

25   Q     Where was that?
```

                              70

1  A  On the east side of Detroit

2  Q  Okay.

3     Off what street?

4  A  Off of Warren, I mean, off of Southampton.

5  Q  Southampton?

6  A  Yes.

7  Q  Okay.

8     You're kind of trailing off.  You've got to

9     keep your voice up a little bit, okay?

10 A  Yes.

11 Q  If I get some curious looks at the end of the aisle

12    here or I'm seeing hands go up, that's a signal to

13    you to raise your voice, all right?

14 A  Okay.

15    THE COURT:  And let me interrupt and say to

16    those folks towards the end, if you can't hear, if

17    you'd kindly raise your hand so we could make sure

18    you get the answers please.

19 Q  **(By Mr. Walton, continuing)**  Back on February 9th,

20    of 2003, you said you were living on Southampton

21    Street, correct?

22 A  I lived on Bishop.  I lived off of Southampton.

23 Q  Okay.

24    All right.

25    Who were you living with?

71

1   A   My mother and my three brothers.

2   Q   What's your Mom's name?

3   A   Ra'Leisha Dowl.

4   Q   And you have three brothers?

5   A   Yes.

6   Q   What are there names?

7   A   Macody (phonetic), Randalia (phonetic), Aubrey.

8       THE COURT REPORTER:   I'm sorry.

9       THE  WITNESS:  Macody, Randalia, Aubrey.

10  Q   **(By Mr. Walton, continuing)**   Okay.

11      Can you tell the Jury the ages of your brothers?

12  A   Fifteen (15), ten, and six.

13  Q   Okay.

14      Was that at the time of February?

15  A   No.

16  Q   That's now?

17  A   Yes.

18  Q   Back on February 9th, of 2003, how old were you?

19  A   Sixteen (16)?

20  Q   Do you remember what day of the week that was?

21  A   I think it was on a Sunday?

22  Q   That day, do you remember what you were doing?

23  A   Yes.   Watching my brothers.

24  Q   Your brothers?

25  A   Yes.

72

```
 1   Q     You were babysitting?

 2   A     Yes.

 3   Q     Where was your Mom?

 4   A     She was with her friends.

 5   Q     And who was her friends name?

 6   A     Lacey.

 7   Q     Okay.

 8              You've got to keep your voice up, okay?

 9   A     (No verbal response.)

10   Q     Did you ever learn or --- how did you find out that

11         your Mom was with Lacey?

12   A     She told me she was going with her friend.

13   Q     I'm sorry?

14   A     She told me that ---

15              MR. TAYLOR:    (Interposing)    Objection as to

16         hearsay.

17              MR. WALTON:    It goes to state of mind, your

18         Honor. A statement of future intent, your Honor,

19         which is admissible under 803 subparenth 2.

20              THE COURT:    The answer may stand.

21              MR. WALTON:    Thank you.

22   Q     (By Mr. Walton, continuing)    Did she tell you this

23         in person?

24   A     Yes.

25   Q     Okay.
```

```
 1              Now do you remember about what time of day that

 2         was?

 3    A    It would have to be --- it was like close to the

 4         evening.

 5    Q    Okay.

 6              All right.

 7              While you're at home with your brothers, um ---

 8         did anything unusual happen?

 9    A    Yes.   Yes.   I got a phone call.

10    Q    Okay.

11              Did you pick up the phone?

12    A    I think my brother picked up the phone and gave it to

13         me.

14    Q    Which brother are you talking about?

15    A    The oldest one, the fifteen (15) year old.

16    Q    Is that Cody?

17    A    Yes.

18    Q    Okay.

19              Did you talk to the person on the other end of

20         the phone?

21    A    Yes.

22    Q    And who was that person?

23    A    Kevin.

24    Q    Kevin?

25    A    Yes.
```

```
 1   Q    Do you see the person that you know as Kevin in

 2        church --- in Court here today?

 3   A    Yes.

 4   Q    Can you please indicate where that person is seated

 5        and an item of clothing that they are wearing?

 6   A    He's sitting over there (indicating) wearing the blue

 7        shirt.

 8   Q    Okay.

 9             This gentleman here (indicating)?

10   A    Yes.

11             MR. WALTON:   I ask the record to reflect the

12        identification of Kalvin Washington for purposes of

13        this record?

14             THE COURT:   It may so indicate.

15   Q    (By Mr. Walton, continuing)    You knew him as Kevin?

16   A    Yes.

17   Q    How long did you know him as Kevin?

18   A    About a month.

19   Q    I'm sorry?

20   A    About a month.

21   Q    How did you meet Kevin?

22   A    From my mother.

23   Q    Did you know if Kevin and your mother had any type of

24        relationship?

25   A    They were dating.
```

```
1    Q    Dating?

2    A    Yes.

3    Q    Okay.

4            Had Kevin ever come over to your house?

5    A    Yes.

6    Q    Okay.

7            What was your relationship with Kevin prior to

8         the date of February 9th, 2003?

9    A    I thought he was a nice person.

10   Q    Okay.

11           You never had a fight with him?

12   A    No.

13   Q    Never a harsh word?

14   A    No.

15   Q    Okay.

16           Did you like him?

17   A    Yes.

18   Q    Was he nice to you?

19   A    Yes.

20   Q    Um --- prior to February 9th, of 2003 did you ever go

21        out with him anywhere?

22   A    Yes.

23   Q    You and Kevin?

24   A    Yes.

25   Q    Where was that?
```

76

1   A   We went to Pizza Hut two blocks away from my house.

2   Q   How did you get to the Pizza Hut?

3   A   Drove.

4   Q   Okay.

5       Just you and him?

6   A   Yes.

7   Q   Okay.

8       And why did you go to Pizza Hut?

9   A   To get some pizzas.

10  Q   Did you pick up pizza?

11  A   Yes.

12  Q   What did you do after you picked up the pizza?

13  A   We went back home.

14  Q   You brought it back home?

15  A   Yes.

16  Q   Okay.

17      Other than that ---

18  A   (Interposing)   Excuse me.

19  Q   It's okay.

20      Other that than one time that you went with him

21      to Pizza Hut to pick up pizza, had you ever driven

22      with him anywhere else?

23  A   No.

24  Q   Okay.

25      You said your mother had been dating him for

```
 1        about a month, correct?

 2   A    Yes.

 3   Q    Okay.

 4             Um --- had he been over --- had he been over to

 5        your house?

 6   A    Yes.

 7   Q    Okay.

 8             Uh --- did you guys ever talk about doing

 9        something together?

10   A    Yes.   He was talking about how he wanted to take ---

11             THE COURT REPORTER:   (Interposing)   I'm sorry,

12        Ma'am.   I can't hear you.

13             THE WITNESS:   He always talked about how he

14        wanted to take me shopping.

15   Q    (By Mr. Walton, continuing)   Shopping?

16   A    Yes.

17   Q    Okay.

18             If I can, I want to bring you back to the date

19        of February 9th, of 2003.

20             You said you received a phone call and it was

21        Kevin on the line, correct?

22   A    Yes.

23   Q    Okay.

24             Did you talk to him?

25   A    Yes.
```

1   Q    What did you talk about, if you recall?

2   A    He asked me where my mother was.

3   Q    I'm sorry?

4   A    He asked me where my mother was.

5   Q    Okay.

6          What did you tell him?

7   A    That she was with her friend.

8   Q    With her friend?

9   A    Yes.

10  Q    Okay.

11         Well was she at the house then?

12  A    My mother, no.

13  Q    Okay.

14         So you told him that Mom's not there?

15  A    Yes.

16  Q    Okay.

17         Um --- did you talk about anything else at that

18  time?

19  A    He told me he was on his way and to come outside when

20  he get there.

21  Q    I'm sorry?

22  A    He told me he was on his way and to come outside when

23  he got there.

24  Q    You know what, we're going to have to do this a

25  little differently.   I'm going to have to ask you

79

1         questions from back here, okay?

2   A    (No verbal response.)

3   Q    Because you're going to have to keep your voice up,

4         all right?

5   A    (No verbal response.)

6   Q    Yes?

7   A    Yes.

8   Q    A little louder please.

9   A    Yes.

10  Q    Okay.

11           When you talked to him on the phone, was this a

12        long conversation?

13  A    No.

14  Q    Okay.

15           Did you hang up the phone?

16  A    Yes.

17  Q    What do you recall happening next?

18  A    He called like a few minutes later and told me to

19        come outside.

20  Q    Okay.

21           And did you go outside?

22  A    Yes.

23  Q    Can you tell the Jury what you saw when you got

24        outside?

25  A    I saw him pulling up in front of my house

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

```
1   Q     Okay.

2              Was he driving a car, a truck, a motorcycle?

3   A     A car.

4   Q     Can you describe the car?

5   A     It was a Malibu.   A four-door Malibu.

6   Q     All right.

7              And did he pull it in the driveway or in the

8         street?

9   A     He was on the street in front of my house.

10  Q     Okay.

11             When you saw him pull up, what did you do?

12  A     I got in the car.   Got in the car.

13  Q     Okay.

14             Did you talk to any of your brothers beforehand?

15  A     Yes.

16  Q     Who did you talk to?

17  A     The fif --- my brother, the oldest one.

18  Q     Cody?

19  A     Yes.

20  Q     What did you say to Cody?

21  A     I told him to tell Ma that I went with Kevin.

22  Q     Okay.

23             And did you get in the car?

24  A     Yes.

25  Q     What part of the car did you get into?
```

```
 1   A    The passenger side.

 2   Q    Okay.

 3             Was there anyone else in the car?

 4   A    No.

 5   Q    Did you notice the Defendant doing anything when you

 6        got in the car?

 7   A    He was talking on the phone and like uh --- he was

 8        talking on the phone.

 9   Q    Okay.

10             Do you know who he was talking to?

11   A    No.

12   Q    Okay.

13             When you got in the car, what do you recall

14        happening next?

15   A    Excuse me.   We drove off.

16   Q    Okay.

17             Did he say anything to you at this point?

18   A    No, not at that point.   But a while, like five or

19        ten minutes after he was driving he was talking about

20        how I was about to become a lady tonight.

21   Q    I'm sorry.

22   A    While he was driving he was talking about how I was

23        about to become a lady tonight.

24   Q    Okay.

25             When he made that comment did you know what he
```

1       was talking about?

2  A   Not --- no.   I was confused.

3  Q   Where did you think you were going?

4  A   Maybe to go get something to eat, maybe, you know,

5     like going shopping or something.   I don't know.

6  Q   And why did you think that?

7  A   Because he always talked about it and I thought

8     that's where he was taking me.

9  Q   Okay.

10       Um --- did you trust him?

11  A   Yes.

12  Q   Were you afraid of him at all?

13  A   No.   Not at that time.

14  Q   Okay.

15       When he makes this comment to you that you're

16     about to become a lady, how do you feel at that

17     point?

18  A   Kind of strange.   Why would he, you know, say

19     something like that about my becoming a lady tonight.

20  Q   Okay.

21       What do you recall happening next?

22  A   Well I had looked up and we was on the freeway.   And

23     I had looked up and it said the Guest Hotel.   And

24     then the next thing you know, we pulled up in the

25     parking lot of the hotel and he just parked his car.

1    was talking about?

2  A   Not --- no.   I was confused.

3  Q   Where did you think you were going?

4  A   Maybe to go get something to eat, maybe.   You know,

5    like going shopping or something.   I don't know.

6  Q   And why did you think that?

7  A   Because he always talked about it and I thought

8    that's where he was taking me.

9  Q   Okay.

10    Um --- did you trust him?

11 A   Yes.

12 Q   Were you afraid of him at all?

13 A   No.   Not at that time.

14 Q   Okay.

15    When he makes this comment to you that you're

16    about to become a lady, how do you feel at that

17    point?

18 A   Kind of strange.   Why would he, you know, say

19    something like that about my becoming a lady tonight.

20 Q   Okay.

21    What do you recall happening next?

22 A   Well I had looked up and we was on the freeway.   And

23    I had looked up and it said the Guest Hotel.   And

24    then the next thing you know, we pulled up in the

25    parking lot of the hotel and he just parked his car.

83

1   Q    Okay.

2        You said you were on the freeway.

3        Do you remember which freeway?

4   A    Yes.

5   Q    Which freeway?

6   A    I75 going north.

7   Q    Okay.

8        And you said you pulled off the road at some

9        point?

10  A    Yes.

11  Q    Okay.

12       Do you remember the exit?

13  A    I think it was like Nine Mile and John R.

14  Q    And when you pulled off the exit, where did you say

15       you were?

16  A    We pulled into the parking lot of the Guest Hotel.

17  Q    Okay.

18       When you pull off, do you pull into the parking

19       lot?

20  A    Excuse me?

21  Q    When you pull off the freeway, do you pull into the

22       parking lot?

23  A    Yes.

24  Q    How do you know it was the Guest Hotel?

25  A    Because I seen it when I uh --- when I was on the

84

1        freeway.   It was in big red letters.

2   Q   What was big red letters?

3   A   Excuse me?

4   Q   What's big red letters?

5   A   The name of the hotel.

6   Q   Okay.

7        Um --- what happens when you pulled into the

8        parking lot?

9   A   He's talking about how I'm going to become a lady

10       tonight.   And he asked me to give him a kiss.

11  Q   Okay.

12       Let me slow you down and stop you a little bit.

13       Do you remember where the car was parked?

14  A   It was parked facing Nine Mile.

15  Q   I'm sorry?

16  A   It was parked facing Nine Mile.

17  Q   Okay.

18       And you were still in the front seat?

19  A   Yes.

20  Q   From the point that you left your house and the point

21       that you got to the hotel did you stop anywhere else?

22  A   No.   We just went straight there.

23  Q   Okay.

24       Was he on the phone the entire time?

25  A   No.

85

1   Q   Okay.

2       When you pulled into the parking lot, you said

3   you were parked facing Nine Mile?

4   A   Yes.

5   Q   Okay.

6       Can you describe the area for the Jurors?

7       What's in that general area?

8   A   I seen a strip mall.   A fast food restaurant.

9   Q   Okay.

10      Do you remember the restaurant?

11  A   I remember one of them, McDonalds.

12  Q   Okay.

13      And you said that there was a strip mall?

14  A   Yes.

15  Q   Do you remember where the strip mall was?

16  A   It was across the street.

17  Q   Directly across the street?

18  A   Yes.

19  Q   Okay.

20      What are you thinking when you pulled into the

21  parking lot at this point?

22  A   I started to think, well what are we doing here?

23  Why are we parked here?   And then after he asked me

24  could he have a kiss, and I told him, 'No.'

25  Q   You told him, 'No?'

86

1   A   Yes.

2   Q   Okay.

3       What happened after you told him, 'No?'

4   A   He grabbed my head and put his tongue in my mouth.

5   Q   How did you react?

6   A   I had pulled away and that's when I started getting

7       scared.

8   Q   What do you recall happening next?

9   A   He said that, 'You're going to become a lady

10      tonight.'  And, 'I'm going to take care of your

11      virginity.'  And that's when he told me to take my

12      panties off.

13  Q   Okay.

14      When he tells you this, where are you in the

15      car?

16  A   I was still in the passenger's seat.

17  Q   Okay.

18      What was he --- you've already described that

19      this is a parking lot, correct?

20  A   Yes.

21  Q   Did you see any people around?

22  A   No.

23  Q   Okay.

24      Um --- he told you he was about --- he was going

25      to take your virginity?

87

1    A    Yes.

2    Q    Are those the words he used?

3    A    He said --- well, he said, 'Like I'm about to take

4         that.'   Because he said, well I knew what he was

5         talking about.   He was talking about my virginity.

6    Q    Okay.

7              I'm about to take that?

8    A    Yes.

9    Q    Was he doing anything when he said that?

10   A    Yes.

11   Q    What was he doing?

12   A    He was pointing.

13   Q    I'm sorry?

14   A    He was pointing between my legs.

15   Q    Okay.

16             How did you feel at that point?

17   A    I was scared.   I was feeling real scared.   And he

18        just told me to take my panties off.

19   Q    Okay.

20             Do you recall what you were wearing that day?

21   A    Yes.

22   Q    What were you wearing?

23   A    A light blue shirt and some blue jeans with a lot of

24        different designs on it and some Perry Ellis boots.

25   Q    Okay.

88

1        Do you remember --- and I know this is kind of a

2    tough question, do you remember if you were wearing

3    underwear that day?

4  A   Yes, because I was on my period at the time.

5  Q   I'm sorry?

6  A   Because I was on my period at the time.

7  Q   Okay.

8        When he tells you to do this stuff, take off

9    your clothes, or take off your pants, is that what he

10   tells you to do?

11  A   Yes.

12  Q   What --- what do you do?

13  A   I took them off.   I was taking to long and he raised

14    his hand up at me and that's when I just kicked my

15    pants off.   And he told me ---

16  Q   (Interposing)   I'm sorry?

17  A   He raised his hand at me and told me to take my pants

18    off and then after that he asked me to put my seat

19    back.

20  Q   Okay.

        When you say he raised his hand at you, what do

21   you mean?

23  A   He raised his hand like he was about to backhand me.

24  Q   Can you demonstrate for the Jury?

25  A   He had his hand up like this (indicating).

89

1      MR. WALTON:   I would like the record to reflect

2    that the Witness has raised her right hand and made a

3    backhand motion.

4  Q    **(By Mr. Walton, continuing)**    Up to this point had

5    you --- and had the Defendant ever hit you before?

6  A    No.

7  Q    Had he ever threatened you before?

8  A    He --- not --- after everything that happened he

9    threatened me.

10  Q    No.   Up until that point.

11  A    No.

12  Q    Okay.

13      When he raises his hand at you, what do you do

14    in response?

15  A    I just took my pants off like he told me to.   I was

16    scared and I didn't want him to hit me.

17  Q    Okay.

18      So now you're sitting in the car without any

19    pants on?

20  A    Yes.

21  Q    Did you take your boots off?

22  A    Yes.

23  Q    What about your underwear?

24  A    I took that off too.   He told me to take those off

25    too.

1  Q    Okay.

2       What do you remember happening next?

3  A    He told me to put my seat back.

4  Q    Put your seat back?

5  A    Yes.

6  Q    What do you mean by that?

7  A    He told me that um --- to put it all the way back and

8       find it and put it back.

9  Q    Okay.

10      Did you put the seat back?

11 A    Yes.

12 Q    How did you put the seat back?

13 A    First I reclined it sort of like the back of the seat

14      was going back and then I had pushed the seat back.

15 Q    Okay.

16      After you pushed the seat back and reclined it,

17      what's the next thing you remember happening?

18 A    He told me to put my legs up.

19 Q    I'm sorry?

20 A    He told me to put my legs up.

21 Q    Put your legs up?

22 A    Mm-hmm.

23 Q    Where was he at this point in the car?

24 A    He was still on his side.   And after my legs were up

25      he had came to the passenger side and he kneeled down

91

```
 1        between my legs.

 2   Q    When you told me you put your legs up, how did you

 3        put your legs up?

 4   A    Both my feet over on the seat.

 5   Q    Then your feet were on the seat as well?

 6   A    Yes.

 7   Q    Okay.

 8             And I'm sorry I interrupted you.

 9             He did what then?

10   A    He came --- he climbed on the passenger side and

11        kneeled down and put his face in between my legs and

12        started some sort of kissing.

13   Q    Okay.

14             How were you feeling at this point?

15   A    Scared.   And I was crying, and he was holding my

16        legs down and then he was asking me, 'Did it feel

17        good?'   And I was still crying and he performed oral

18        sex on me. And then he had stopped.

19   Q    Let me slow you down for a second.

20             Okay?

21   A    (No verbal response.)

22   Q    When you said, 'He had performed oral sex on you,'

23        what do you mean by that?

24   A    He was um --- he was licking my vagina.

25   Q    Okay.
```

92

```
 1                 And you could feel this?

 2   A    Yes.

 3   Q    You said you were crying?

 4   A    Yes.

 5   Q    Did you ask him to stop?

 6   A    Yes.

 7   Q    Did he?

 8   A    No.

 9   Q    Okay.

10   A    He stopped like after a while and he said --- or he

11        asked me, 'Was I scared?'   'And didn't my mother

12        talk to me?'

13   Q    Okay.

14            When --- when he asked you if you were scared,

15        did you respond?

16            Did you say anything to him?

17   A    Mm --- I was still crying and I'm shaking and I

18        didn't respond.

19   Q    When he asked you, 'Did your mother talk to you,' did

20        you know what he was talking about?

21   A    No.

22   Q    Did you ask him any questions about that?

23   A    I --- well we --- I mean --- I just shook my head no.

24        And he said, 'Your mother was supposed to tell you

25        that I was supposed to take you out and take your
```

93

```
 1        virginity.'

 2   Q    Did you believe him at that point?

 3   A    Not really.   But he kept --- he had me convinced

 4        that, yeah.   'Your mother was supposed to talk to

 5        you and say that I was going to take you out and take

 6        your virginity.'   'I was going to take you to the

 7        hotel and take your virginity.'

 8   Q    And he told you this while you were in the parking

 9        lot?

10   A    Yes.

11   Q    How do you feel at that point?

12   A    Upset.   Scared.   And that he got back on his --- on

13        the driver's seat.

14   Q    Did he tell you at all why he was supposed to take

15        your virginity?

16   A    He was talking about how he didn't want me to get no

17        boyfriend.   How he didn't want me to get pregnant

18        sleeping with these little boys.   And he said when I

19        get hot to come to him.   If I wanted to have sex,

20        just come to him.   He didn't want me to go out with

21        no other boys.

22   Q    You said ---

23   A    (Interposing)   Excuse me.

24   Q    (Continuing --- after a time he climbed back over

25        into his seat?
```

94

```
 1   A    Yes.

 2   Q    Okay.

 3             What were you doing at the time?

 4   A    He was just sitting there and he told me to put my

 5        clothes back on.   And he was drinking too.

 6   Q    He was drinking?

 7   A    Yes.

 8   Q    Okay.

 9             Did you put your clothes back on?

10   A    Yes.

11   Q    Do you remember what he was drinking?

12   A    Yes.

13   Q    What was he drinking?

14   A    He was drinking from a bottle of gin.

15   Q    Did you see where he got the gin from?

16   A    No.   All I know was that I seen it in the cup

17        holder.

18   Q    Okay.

19             So he drinks the gin.

20             You put your clothes on?

21   A    Yes.

22   Q    What do you recall happening next?

23   A    He drove --- he drove off on and we ended up at a car

24        wash.

25   Q    I'm sorry?
```

95

```
 1   A     He ended up at this here car wash, because he was

 2         talking about he wanted to go wash his car.

 3   Q     Okay.

 4             So you leave the parking lot at the Guest Hotel,

 5         correct?

 6   A     Yes.

 7   Q     Okay.

 8             And you say you drive where?

 9   A     (No verbal response.)

10   Q     To a car wash?

11   A     Yes.

12   Q     Okay.

13             How long are you in the car driving with him at

14         this point?

15   A     I don't know.   Like maybe ten, fifteen (15) minutes.

16   Q     Okay.

17             And when you're driving do you recognize any of

18         the streets?

19   A     Well the best I remember was seeing a street called

20         Dequindre.

21   Q     Dequindre?

22   A     Yes.

23   Q     Okay.

24             Have you ever been on Dequindre before, that you

25         know of?
```

1  A  I don't remember.  It was like real dark.

2  Q  I'm sorry?

3  A  It was real dark outside.

4  Q  Did you pass Dequindre or are you on Dequindre?

5  A  We passed it.

6  Q  Okay.

7  A  All I remember seeing was these railroad tracks and

8  these big old trucks.  It was like a few houses but

9  it was still real dark.

10  Q  Okay.

11  This is the neighborhood you're describing then?

12  A  Yes.

13  Q  Okay.

14  So you remember Dequindre.  You remember some

15  railroad tracks and some --- what do you mean by

16  trucks?

17  A  Not no tow trucks but them long trucks.

18  Q  Okay.

19  And were these in the general area you were

20  driving?

21  A  Yes.

22  Q  Okay.

23  Did you ever make it to a car wash?

24  A  Yes.

25  Q  Can you describe the area the car wash was in?

97

1   A    It was real dark and it was only light under the car

2        wash.   And there was one empty and he stopped.

3   Q    Okay.

4             What about the neighborhood?   Do you recall

5        what the neighborhood was like?

6   A    I just seen a few houses and that was the only thing.

7        It was like real dark at the time and the only thing

8        I saw was that hand car wash.   It was night time

9        then.

10  Q    Okay.

11            You had mentioned before that the Defendant, Mr.

12       Washington had told you that he was going to get his

13       car washed?

14  A    Yes.

15  Q    Okay.

16            Do you remember when he told you that?

17  A    When he was in the car at the Guest Hotel.   You

18       know, I'm going to have to wash my car.   And that's

19       when he drove off and went to the hand car wash.

20       But he never got out to wash his car.

21  Q    Do you talk with him or does he talk with you at all

22       on the drive from the Guest Hotel to the car wash?

23  A    He just kept saying how my mother was supposed to

24       talk to me about what was supposed to happen that

25       day.

98

```
 1   Q    Okay.

 2             So he's talking about this some more?

 3   A    Yeah.   He just say, 'Your Mama was supposed to talk

 4        to you.'

 5   Q    Okay.

 6             At this point do you believe the story?

 7   A    Yeah.   Because he had me so convinced.   Like he

 8        said, 'Me and your mother, you know, we planned it

 9        and we talked this out.'

10   Q    So the answer is, 'Yeah.'   You believed him?

11   A    Yes.

12   Q    Okay.

13             How did that make you feel?

14   A    I was upset and I was mad.   And I was thinking how

15        could my mother do this?

16   Q    What was your relationship like with your Mom at that

17        time?

18   A    We had a nice relationship but it was like we was

19        going through a few problems during that time.

20   Q    Okay.

21             What kind of problems?

22   A    With me, it was like mostly about school.

23   Q    Okay.

24             It wasn't anything about boys or anything like

25        that, was it?
```

```
1    A    Not really.

2    Q    When you get to the car wash, do you remember where

3         you parked?

4    A    Excuse me.   We parked inside the car --- where you

5         know, the part where you wash your car, it was inside

6         one of those.

7    Q    Okay.

8              Is this a hand wash car wash?

9    A    Yes.   You wash your own car.

10   Q    You put some money in and wash it yourself?

11   A    Yes.

12   Q    Okay.

13             What happens when the car is stopped now in the

14        car wash?

15   A    He kept saying, 'I'm going to take that.'   And F.

16        He pulled down his pants and asked me to suck on his

17        penis.

18   Q    He pulled down his pants?

19   A    Yes.

20   Q    Okay.

21   A    And he pulled out his penis and asked me to suck it

22        and I said, 'No.'

23   Q    What do you remember happening next?

24   A    And he was doing like, you're telling me 'No?'

25        You're telling me 'No?'
```

100

1          And I was like, 'No.'    'I'm not going to do

2    it.'

3          And he was like, 'Well, either you suck my penis

4    or you let me get you down there.'

5          And I said, 'No.'

6          Well he says, 'You're not going to make it home

7    tonight.'    'You're going to learn how to love and

8    you're going to learn how to kiss me.'    And he had

9    drawn back into my --- he got --- he made me --- he

10    told me to take my pants off again.    And he told me

11    to put them in the back seat.    And he left and got

12    back on the passenger side.    And he ---

13  Q   (Interposing)   Let me slow you down a little bit.

14          I know you want to rush through this but we need

15    to slow you down just a bit.

16          Why is it you took your clothes off?

17  A   Because he had me do it.   He raised his hand up by

18    me again.

19  Q   When did he do that?

20  A   It was after I told him, 'No, I wouldn't suck on his

21    penis.'   He said, 'I'm going to take your pants

22    off.'   He had raised his hand up at me so I just did

23    as he asked me to do.

24  Q   Was he saying anything to you other than, 'Take your

25    pants off?'

1  A    I asked him why is he doing this to me?

2       And he said because I'm a virgin.

3  Q    Okay.

4       Did you take your clothes off?

5  A    Yes.

6  Q    Okay.

7       Did you take all your clothes off?

8  A    No.   Just my pants ---

9  Q    (Interposing)   What clothes did you take off?

10  A    My shoes, my pants and my underwear.

11  Q    And what happened after you took your clothes off

12       after the second time?

13  A    He come back on the passenger side and started oral

14       sex on me again.

15  Q    And what do you mean by oral sex?

16  A    He started licking my vagina again.

17  Q    Was this just like at the Guest Hotel?

18  A    Yes.

19  Q    Does this eventually stop?

20  A    Yes.   He said, --- he said, 'You scared.'   And he

21       started calling me names.

22  Q    What names did he start calling you.

23  A    He called me a bitch.

24  Q    Okay.

25       And when he called you this name, how do you ---

102

```
 1        what do you --- after he calls you this name, what do

 2        you remember happening next?

 3   A    He was saying that I'm not going to make it home.

 4        He just kept saying how I wasn't going to make it

 5        home.  And he asked me if I had ever been beaten

 6        before.

 7   Q    He tells you, you're not going to make it home?

 8   A    Yes.

 9   Q    And have you ever been beaten before?

10   A    Yes.

11   Q    How did that make you feel?

12   A    It made me feel scared.  Like I was just thinking

13        that I wasn't going to go home.  But he kept saying

14        how I wasn't going to make it home that day.

15   Q    This car wash that you were in, do you know what city

16        that was in?

17   A    Detroit.

18   Q    Okay.

19            Had you ever been to that car wash before?

20   A    No.

21   Q    Had you ever been to that neighborhood before?

22   A    No.

23   Q    When you left the house earlier that day and you got

24        into the Defendant's car, you've already described

25        what you were wearing, were you wearing any other
```

103

1     winter clothes?

2  A   I had a coat.

3  Q   Okay.

4         A coat?

5  A   Yes.

6  Q   Okay.

7         Why didn't you just get out of the car at that

8     point?

9  A   Because --- I mean I don't really know why I didn't

10    get out of that car.   I was scared and I didn't know

11    what to do.

12 Q   Okay.

13        When he stops performing oral sex on you and he

14    makes these --- these comments to you and calls you a

15    name, and says that you're going to learn to love

16    him, do you remember what happens --- does anything

17    else happen in the car?

18 A   He started drinking again.

19 Q   Okay.

20        The same gin?

21 A   Yes.   And ---

22 Q   (Interposing)   And ---

23 A   And ---

24 Q   (Continuing) --- Okay.

25        Anything else happen in the car?

104

1        THE COURT REPORTER:   Just a moment.

2        MR. WALTON:   Okay.   Hang on one second.

3        (Where upon a brief delay was had.)

4        * * *

5        THE WITNESS:   Thank you.

6  Q  **(By Mr. Walton, continuing)**   Okay.

7        What happens after --- what do you recall

8  happening next?

9  A  I seen him pull out some white powder stuff and he

10  starts sniffing on it.

11  Q  Okay.

12        Did you see where he got the white powder?

13  A  He pulled it out of his pocket.

14  Q  Okay.

15        And you say he started to sniff it?

16  A  Yes.

17  Q  Okay.

18        What do you recall happening next?

19  A  Anyways he told me to put back on my clothes and then

20  we left the car wash and I don't know --- we ended up

21  back in our neighborhood.

22  Q  Okay.

23        Before you put your clothes on do you ask him

24  any questions?   Do you have any conversation with

25  him at all?

```
1    A     I don't remember.

2    Q     Okay.

3                Do you put your clothes back on?

4    A     Yes.

5    Q     Okay.

6                After you put your clothes back on what happens

7          next?

8    A     We drove off from the car wash and we got to my

9          neighborhood.   And he was riding around and we kept

10         stopping.   And he kept telling me to tell my mother

11         a story.

12   Q     Let me stop you there.

13               You leave the car wash and you drive, you said,

14         'To your neighborhood?'

15   A     Yes.

16   Q     So things start becoming familiar to you?

17   A     Yes.

18   Q     Okay.

19               And you said you would stop where?

20   A     Right in front of the --- like around the

21         neighborhood, in front of different houses.

22   Q     Would you pull into the driveway, or stop in the

23         street?

24   A     In the street.

25   Q     Okay.
```

1          And you said he started telling you things to

2      tell your Mom?

3   A  Yes.

4   Q  Like what.

5   A  He told me when I went home to tell my mother that,

6      'I'm not feeling well.'   That, 'I'm cramping'

7      because I was on my period at the time.   And when

8      everybody leaves to take a shower then go upstairs

9      and lay in my mother's bed and wait till he got

10     there.

11  Q  You were supposed to do this when you got home Sunday

12     night?

13  A  No, at the next day.   And before that he told me to

14     tell my mother that, 'We been to Northland.'   That,

15     'We've been to the video store looking to try to rent

16     videos,' or whatever.

17  Q  So you're supposed to tell your Mom that you were

18.    cramping and take a shower.   And you were supposed

19     to do it that night or the next day?

20  A  The next day, that morning.

21  Q  Okay.

22         And you were supposed to go in your Mom's bed?

23  A  Yes.

24  Q  Had you ever done that before?

25  A  No.

1  Q  And you said this happened one time or did this

2     happen --- when he tells you what to say or just

3     tells you what you're supposed to do when you get

4     home, did this happen just one time?

5  A  No, he tells me to repeat it so I can remember to

6     tell my mother when I got in the house.

7  Q  Okay.

8     Does he tell you anything else?

9  A  He tells me if things don't go the way he planned,

10     that he was going to have somebody go to my brother's

11     school, get them and kill them.  And he's going to

12     kill my great aunt and great uncle next door, and my

13     cousins down the street.

14  Q  Okay.

15     Did you have any family in the neighborhood?

16  A  Yes.

17  Q  Who lived next door to you?

18  A  My great aunt and uncle.

19  Q  Okay.

20     And did you have any other family in the

21     neighborhood?

22  A  Yes.

23  Q  And who was that?

24  A  I have a cousin just at the end --- I had a cousin at

25     the end of the block and a cousin around the corner.

1    Q    The great aunt and uncle and the cousin at the end of

2         the block, did you ever talk to him about these

3         family before?

4    A    Excuse me?

5    Q    The great aunt that lived next door to you and the

6         cousin that lived at the end of the block, had you

7         ever talked to the Defendant about this family

8         before?

9    A    Well my mother has.   She's always like I have an

10        uncle down there next door and a cousin down the

11        street.

12   Q    Okay.

13            All right.

14            Um --- when he tells you that he's going to ---

15        if this doesn't go the way he planned, he's going to

16        have these --- your family killed, and someone follow

17        your brothers to school, do you believe him?

18   A    Yes.

19   Q    Why do you believe him?

20   A    Because he just picked up the phone out of his stuff

21        and he called somebody.   And he was talking about

22        how he went --- he was just making plans on how to do

23        a drive-by on our street.

24   Q    Okay.

25            I know you lived through this but I need you to

1      slow down and be a little more descriptive.

2            What do you mean?   What was he doing that made

3      you believe he was capable of doing this?

4  A    He was on the phone talking to someone.

5  Q    When?

6  A    He was in the car when we was driving around the

7      neighborhood.

8  Q    Okay.

9            Does he pick up the phone?

10  A    Yes.

11  Q    Does he dial the phone?

12  A    Yes.

13  Q    Um --- do you hear him talk?

14  A    Yes.

15  Q    And what types of things is he saying on the phone?

16  A    He said, 'I got' --- he was --- I don't remember the

17      exact words he was saying   But I knew he was making

18      plans with somebody to do something to harm to my

19      family.

20  Q    And he does this in your presence, right?

21  A    Yes.

22  Q    Okay.

23            Did he --- while you were driving in the area,

24      you said you stopped in front of a couple of houses.

25      He tells you what's going to happen and he's also on

1     the phone occasionally?

2         Did you go anyplace else?

3  A   Yes.   The last place that we stopped was a Burger

4     King.

5  Q   Was this in your neighborhood?

6  A   Yes.

7  Q   Do you remember where the Burger King was?

8  A   It was on East Warren.

9  Q   I'm sorry?

10  A   It was on East Warren.

11  Q   East Warren?

12  A   Yes.

13  Q   What happens when you pull up --- what happens when

14     you're by the Burger King?

15  A   He asks me did I want to get something to eat and I

16     said, 'No.'   And then the phone had rung and I could

17     hear my mother.  He's talking to my mother.   My

18     mother had called.

19  Q   Okay.

20  A   And then ---

21  Q   (Interposing)   Your mother had called his cell

22     phone?

23  A   Yes.

24  Q   How did you know it was your mother?

25  A   Because I heard her voice over the phone.

1  Q      Okay.

2          Was he talking to your Mom?

3  A      Yes.    And then he asked --- like my mother wanted to

4          speak to me, so he gave me the phone and she said I

5          was in trouble.

6  Q      For what?

7  A      I don't know.    She just said I was in trouble.

8          Maybe because I left the house and came in the car

9          and didn't tell her.

10 Q      Okay.

11          All right.

12          You're in the car now and he hands you the cell

13          phone.   Your Mom's on the other end of it.   Do you

14          call out for help to your Mom?

15 A      No.

16 Q      Why not?

17 A      Because I was afraid of what he might do to me if I

18          said something while he was in the car.   Because

19          maybe he could have drove off again and never brought

20          me back home.

21 Q      Did you think you might die?

22 A      I --- I don't know.   I was just studying my

23          heartbeat.

24 Q      What happens at --- what do you recall happening

25          next?

| | | |
|---|---|---|
| 1 | A | It was that --- he was telling my mother that we was |
| 2 | | just getting videos. And then after that we drove |
| 3 | | back to my house. |
| 4 | Q | When you say you hear him say to your mother that you |
| 5 | | were getting videos, do you hear this on the phone? |
| 6 | A | I heard him say that to my mother --- |
| 7 | Q | (Interposing) Okay. All right. |
| 8 | A | (Continuing) --- on the phone. |
| 9 | Q | That's --- thank you. |
| 10 | | What do you remember happening next? |
| 11 | A | We drove back to my house. |
| 12 | Q | When you pull up to your house, what do you see? |
| 13 | A | My mother's car parked in the driveway. |
| 14 | Q | Okay. |
| 15 | | And where does the Defendant park? |
| 16 | A | In front of my mother's truck. |
| 17 | Q | I'm sorry? |
| 18 | A | In front of my mother's truck. |
| 19 | Q | So it's parked on the street then? |
| 20 | A | On the driveway. |
| 21 | Q | Okay. |
| 22 | | How does he park in front of her then? |
| 23 | A | He just pulled up in front of it. |
| 24 | Q | Oh, okay. |
| 25 | | All right. |

1          Do you get out of the truck, out of the car?

2   A    Yes.

3   Q    Okay.

4          By the way, do you remember if this was a two or

5          four-door Malibu?

6   A    It's a four door.

7   Q    Okay.

8          You get out of the car.

9          Does he get out of the car?

10  A    Yes.

11  Q    Where do you go?

12  A    I go to the side door.   And he was in front of me

13        and he had opened up the door and he had me go in

14        first.   And while I go in the house he had touched

15        me on my butt.

16  Q    What do you mean, touched you on your butt?

17  A    He had rubbed it.   Like he was trying to grab it.

18  Q    Describe what you mean.

19  A    He had took his hand and put his up like that

20        (indicating) and he grabbed it while I was going up

21        the stairs.

22  Q    How did that make you feel?

23  A    Upset and mad and I was crying.   I just went

24        straight to my room.

25  Q    Okay.

114

1   So when you come to the side door, where is your

2  room?

3 A When you first come in the house, you go up --- when

4  you first come in the house you go up like a stair,

5  and that's the kitchen.   And you come off the

6  kitchen and you turn left and then there's my room.

7 Q Okay.

8   So your house is --- your bedroom is on the

9  ground floor?

10 A Yes.

11 Q Okay.

12   Do you go directly to your room?

13 A Yes.

14 Q Do you share your room with anyone?

15 A No.

16 Q What do you do when you get into your room?

17 A I just laid on my bed and started crying.

18 Q Do you know if the Defendant was in the house at that

19  point?

20 A He was.

21 Q How do you know that?

22 A Because he was right behind me and he went --- he was

23  right behind me and he went straight up to my

24  mother's room?

25 Q Where's your mother's room compared to yours?

1    A    Her room is upstairs.

2    Q    So this is a two story house?

3    A    Yes.

4    Q    Okay.

5         Um --- to get to your mother's room does he have

6         to go through the kitchen?

7    A    Yes.

8    Q    Okay.

9         Does he go through the kitchen?

10   A    Yes.

11   Q    You are in your room, correct?

12   A    Yes.   He has to pass my room and my brother's room

13        to go upstairs.

14   Q    Okay.

15        Do you close your door?

16   A    No.

17   Q    Okay.

18        What's the next thing that you recall happening?

19   A    I hear him go upstairs to my mother's room.   And I

20        um --- left out of my room and I went up to the um --

21        - stairs to hear what was going on.   And all I heard

22        is him telling her to shut up.   And I heard her

23        crying.   And that's when I woke my brothers up.

24        They put on their coats and shoes and we left out the

25        house.

1    Q    Okay.

2         What time of day or night is this?

3    A    It was like around --- it was like around ten (10:00)

4         in the evening.   Because they was asleep and it was

5         a school night.

6    Q    Okay.

7         You said you woke up your brothers?

8    A    Yes.

9    Q    All three of them?

10   A    Yes.

11   Q    Do they share a room?

12   A    No.   The smallest two do.   The six-year old and the

13        ten-year old share a room.   And the fifteen (15)

14        year old has his own room.

15   Q    Do you wake them all up?

16   A    Yes.

17   Q    What do you do after you wake them up?

18   A    I tell them to put on their coats and their shoes.

19        And they was a little bit confused about what was

20        going on. And I just told them, 'To hurry up, put on

21        your shoes and coat.'   And we snuck out.

22   Q    Okay.

23        Where'd you go?

24   A    I went to the youngest --- my youngest brother, I

25        went to his uncle's house.

EXHIBIT LT1

1   STATE OF MICHIGAN)

2   COUNTY OF OAKLAND)

3               I, Gwendolyn D. Finley, Certified

4       Reporter of the Sixth Judicial Circuit Court, State

5       of Michigan, do hereby *certify that the foregoin

6       pages 1-121 inclusive, comprise a true and correct

7       transcript of the proceedings and testimony taken

8       in the matter of People of the State of Michigan vs

9       Kalvin Lamar Washington, Case Number 2003-190459

10      FH, on Friday, April 2, 2004.

11                          Gwendolyn D. Finley

12                          Gwendolyn D. Finley, CSR-7127

13                          14877 Prevost

14                          Detroit, Michigan  48227

15                          (313) 986-0650

16

17  July 27, 2004

18

19  *This is not a certified copy without an original

20   signature.

21

22

23

24

25

                                                    122

# Attachment 3

# REGISTER OF ACTIONS
## CASE NO. 03-004019-01-FC

| State of Michigan vs. Kalvin Lamar Washington | § | Location: | **Criminal Division** |
|---|---|---|---|
| | § | Judicial Officer: | **Slavens, Mark T.** |
| | § | Filed on: | **03/31/2003** |
| | § | Case Number History: | **03057904-01** |
| | § | | **03306622-01** |
| | § | Case Tracking Number: | **03306622-01** |
| | § | CRISNET/Incident No.: | **03-341** |

---

### CASE INFORMATION

| Offense | | Statute | Deg | Date | Case Type: | **Capital Felonies** |
|---|---|---|---|---|---|---|
| 1. | Criminal Sexual Conduct - First Degree (personal Injury) | 750520B1F | . | 03/18/2003 | Case Status: | **08/20/2003   Final** |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | Case Flags: | **Case Needs to be Abstracted to** |
| 2. | Criminal Sexual Conduct - First Degree (personal Injury) | 750520B1F | . | 03/18/2003 | | **MI Secretary of State** |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | | **Case has PDF Electronic** |
| 3. | Criminal Sexual Conduct - First Degree (personal Injury) | 750520B1F | | 03/18/2003 | | **Transcripts** |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | | |
| 4. | Criminal Sexual Conduct - First Degree (personal Injury) | 750520B1F | . | 03/18/2003 | | |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | | |
| 5. | Criminal Sexual Conduct - First Degree (personal Injury) | 750520B1F | . | 03/18/2003 | | |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | | |
| 6. | Criminal Sexual Conduct - Third Degree (force or Coercion) | 750520D1B | | 03/18/2003 | | |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | | |
| 7. | Criminal Sexual Conduct - Third Degree (force or Coercion) | 750520D1B | . | 03/18/2003 | | |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | | |
| 8. | Criminal Sexual Conduct - First Degree (weapon Used) | 750520B1E | . | 03/18/2003 | | |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | | |
| 9. | Criminal Sexual Conduct - Third Degree (force or Coercion) | 750520D1B | | 03/18/2003 | | |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | | |
| 10. | Criminal Sexual Conduct - First Degree (weapon Used) | 750520B1E | . | 03/18/2003 | | |
| | Arrest: DPSCU - Detroit Pd Sex Crimes Unit | | | | | |

**Statistical Closures**
08/20/2003    Jury Verdict

---

### PARTY INFORMATION

| | | *Lead Attorneys* |
|---|---|---|
| **Plaintiff** | **State of Michigan** | **Trzcinski, Thomas J.** |
| | | (313) 224-8742(W) |
| | | |
| **Defendant** | **Washington, Kalvin Lamar** | **Robinson, John Christian** |
| | *Black  Male* | *Retained* |
| | *SID: MI1464183A* | (313) 243-4885(W) |
| | *Other Agency Number: 477909 Detroit Police Identification Number* | |

---

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 03/18/2003 | Case Needs to Be Abstracted to MI Secretary of State | |
| 03/18/2003 | Recommendation for Warrant | |

*Printed on 03/03/2022 at 10:08 AM*

# REGISTER OF ACTIONS
## THIRD JUDICIAL CIRCUIT OF MICHIGAN
## CASE NO. 03-004019-01-FC

| | |
|---|---|
| 03/18/2003 | Warrant Signed |

03/19/2003 **Arraignment On Warrant** (Judicial Officer: Lockhart, Steve)
Resource: Court Rpt/Rec  104  Dixon, Ronnie
*Held*

   03/19/2003 **Plea** (Judicial Officer: Lockhart, Steve)
      10. Criminal Sexual Conduct - First Degree(weapon Used)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court
      8. Criminal Sexual Conduct - First Degree(weapon Used)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court
      1. Criminal Sexual Conduct - First Degree(personal Injury)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court
      2. Criminal Sexual Conduct - First Degree(personal Injury)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court
      3. Criminal Sexual Conduct - First Degree(personal Injury)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court
      4. Criminal Sexual Conduct - First Degree(personal Injury)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court
      5. Criminal Sexual Conduct - First Degree(personal Injury)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court
      6. Criminal Sexual Conduct - Third Degree(force or Coercion)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court
      7. Criminal Sexual Conduct - Third Degree(force or Coercion)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court
      9. Criminal Sexual Conduct - Third Degree(force or Coercion)
        Defendant Stand Mute: Plea of Not Guilty Entered by Court

03/19/2003 **Interim Condition for Washington, Kalvin Lamar** (Judicial Officer: Lockhart, Steve)
- 10%
  $25,000.00

03/31/2003 **Preliminary Exam** (Judicial Officer: Garrett, Ruth)
Resource: Court Rpt/Rec  30  Martin, Paulette
*Held: Bound Over*

   03/31/2003 Bound Over

   03/31/2003 **Disposition** (Judicial Officer: Garrett, Ruth)
      10. Criminal Sexual Conduct - First Degree(weapon Used)
        Dismissed
      8. Criminal Sexual Conduct - First Degree(weapon Used)
        Dismissed

03/31/2003 Motion To Amend The Information

   03/31/2003 Filed

03/31/2003 Motion To Dismiss A Charge

   03/31/2003 Filed

03/31/2003 Appearance By A Retained Attorney Filed

03/31/2003 Trial Docket

   03/31/2003 Filed

*Printed on 03/03/2022 at 10:08 AM*